UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL T. HUDSON,

                         Plaintiff,

       v.                                          9:20-CV-581
                                                      (LEK/DJS)

CORRECTION OFFICER C. KIRKEY,

                         Defendant.
_____

**APPEARANCES:**                                    **OF COUNSEL:**

BUCKLEY, MENDLESON, CRISCIONE,     RICHARD J. FRONTERO, III, ESQ.[1]
AND QUINN
Attorneys for Plaintiff
29 Wards Lane
Albany, NY 12204

HON. LETITIA JAMES                     OLIVIA R. COX, ESQ.
Attorney General of the State of New York   ANTHONY HUNTLEY, ESQ.
Attorneys for Defendant Kirkey             MATTHEW GALLAGHER, ESQ.
The Capitol                                         Assistant Attorneys General
Albany, New York 12224

**DANIEL J. STEWART**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

    *Pro se* Plaintiff Michael Hudson brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights while he was in the custody of the Department of Corrections and Community Supervision ("DOCCS")

---

[1] Plaintiff has appeared *pro se* throughout the course of the proceedings. Attorney Richard Frontero was appointed *pro bono* counsel for the limited purpose of the Exhaustion Hearing. Dkt. No. 59.

- 1 -

at Mohawk Correctional Facility. *See* Dkt. No. 1, Compl. The matter is presently before the Court for a decision after an Exhaustion Hearing which was held on June 7, 2023. *See Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011). For the reasons that follow, and based upon the credible evidence presented at the Hearing, the Court recommends that the Plaintiff's Complaint be dismissed upon the grounds that he failed to exhaust his administrative remedies.

## I. PROCEDURAL HISTORY

Plaintiff alleges that on September 4, 2019, he was assaulted by correctional staff while incarcerated at the Mohawk Correctional Facility. *See generally* Dkt. No. 1, Compl. Plaintiff alleges first that he was summoned to the Sergeant's office to be questioned about whether he wished to act as a witness for another inmate who was claiming to have been assaulted by correctional staff, and that because he refused to deny knowledge of the event he was beaten by several officers. Compl. at ¶¶ 12-18. According to the Complaint, Plaintiff was permitted to then leave that office, return to his housing unit, and then went to his assigned work at the Walsh Medical Unit inside the Facility. *Id.* at ¶¶ 19-21. Plaintiff alleges that upon arrival at his work location, Defendant Kirkey further assaulted him. *Id.* at ¶¶ 25-31. In particular, it is claimed that Defendant Kirkey assaulted Plaintiff during a pat frisk, struck him in his rib cage with a closed fist, and after Plaintiff was handcuffed and restrained, Kirkey used his baton to strike Plaintiff's legs and he also cut his arm with a sharp object. *Id.* Officer Kirkey admits that he was involved in the use of force with Plaintiff, but denies using inappropriate or excessive force. *See* Dkt. No. 49-2, Decl. of Christopher Kirkey.

Several Motions have been filed in connection with this matter. Critical to the present ruling, on March 2, 2023, Senior District Court Judge Lawrence E. Kahn adopted this Court's Report and Recommendation to dismiss all claims in the Complaint with the single exception of Plaintiff's Eighth Amendment excessive force claim against Defendant Kirkey. Dkt. No. 58, MDO, *adopting in part* Dkt. No. 55, Report-Recommendation and Order. As to that claim, however, Judge Kahn ruled that there remained a question as to whether it had been properly exhausted under the Prison Litigation Reform Act. *Id*. Accordingly, Judge Kahn referred the matter back to this Court to hold an exhaustion hearing. *Id*.

The Court held the Exhaustion Hearing on June 7, 2023, at which Defendant called five witnesses. *See* Dkt. No. 79, Transcript of Proceedings ("Tr."). Plaintiff testified on his behalf but produced no other witnesses. The parties further stipulated to the following Exhibits:

**D-1**. New York State Department of Corrections and Community Supervision ("DOCCS") Directive 4040: Inmate Grievance Program
**D-2**. CORC lists for Plaintiff dated May 18, 2023
**D-3**. Plaintiff location history dated August 27, 2020
**D-4**. Plaintiff's grievance
**D-5**. Transcript of Plaintiff's Deposition taken on January 20, 2022
**D-6**. Plaintiff's Uniform Sentence and Commitment Forms
**D-7**. Supreme Court Information (SCI) #256W-2004
**D-8**. Medical Records
**D-9**. Plaintiff's Inmate Program Assignment History dated August 27, 2020
**D-10**. Correspondence from State Commission of Correction dated September 9, 2019

The parties submitted post-hearing briefs in July 2023. Dkt. Nos. 80 & 81. After consideration of the arguments, and the evidence submitted to the Court during the Exhaustion Hearing, this ruling follows.

## II. DISCUSSION

### A. Standard of Review

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id*. at 524; *Ross v. Blake,* 578 U.S. 632, 639, (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "The exhaustion inquiry thus requires [a court to] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford v. Ngo*, 548 U.S. at 88-90).

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake,* 578 U.S. at 641. As the Supreme Court stated, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Supreme Court has identified three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. at 643-644.

As for the procedure to resolve exhaustion issues, the Second Circuit has ruled that a plaintiff in a lawsuit governed by the PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord*, 652 F.3d at 308-10. The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Saeli v. Chautauqua Cnty., NY*, 36 F.4th 445, 453 (2d Cir. 2022). However, once a defendant has produced reliable evidence that such remedies were available to the plaintiff and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that the remedy was unavailable to him or her. *Saeli v. Chautauqua Cnty., NY*, 36 F.4th at 456 ("If [plaintiff] asserted that he fully exhausted his

administrative remedies, he would not bear the ultimate burden of proving at trial that he complied with all the steps laid out in the grievance policy, including by filing the informal grievance form. Nonexhaustion, as noted above, is an affirmative defense. But [plaintiff] concedes that he did not exhaust his remedies by completing all of the steps in the grievance process. His argument is one about *de facto* unavailability – that he made an *attempt* at compliance with the grievance procedures, only to be thwarted by Jail personnel – an argument for which the plaintiff bears the burden of proof.").

### B. DOCCS Grievance Procedure

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). Exhibit D-1, Directive 4040. The grievance procedure is said to provide for an orderly, fair, and simple method of resolving grievances. *Id.* at § 701.1(a). First, a grievance is submitted by the affected person to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. *Id.* at §§ 701.3(b) & 701.5(b). The complaint must be filed within 21 days of the event. *Id*. at § 701.5(a)(1). The policy provides for a period to informally resolve the grievance, and thereafter to proceed through the various steps in the appeal process. *Id.* at § 701.5(b). However, and particularly relevant to this case, a more expedited procedure applies to complaints involving harassment or assault by corrections officers or other staff on an incarcerated individual. In that circumstance, the complaint regarding staff misconduct would be given a calendar number and recorded with all other grievances but would go directly to the facility superintendent by the end of the day. *Id.* at § 701.8(b). The superintendent then has 25 days to investigate and render a written response. *Id*. at §

701.8(f). If the superintendent fails to render a decision within the 25-day time period, or rules against the incarcerated individual, the grievant may appeal to the Central Office Review Committee ("CORC"). *Id*. at § 701.8(g). CORC has 30 days to review each appeal and render a decision. *Id.* at § 701.5(d)(3). Exhaustion of the grievance procedure only occurs after CORC has rendered its decision.

## B.  Hearing Testimony

### 1.  Rachael Seguin

Rachael Seguin testified and noted that she was the Director of the Inmate Grievance Program (IGP) for DOCCS, and that she had previously been the Assistant Director from 2017 to March 2022. Tr. at pp. 4-6. Part of her job duties included overseeing CORC, which is the final level of the grievance program. Tr. at pp. 6 & 11. She confirmed that the procedures set forth in Exhibit D-1, Directive 4040, were in effect at the time of the events in question and applied to Plaintiff. Tr. at p. 7. She reviewed CORC records and, based upon that review, determined that Plaintiff Michael Hudson never appealed any grievance relating to allegations of a September 4, 2019 assault or alleged misconduct by Correction Officer Kirkey. Tr. at pp. 14-15; Exhibit D-2.

### 2.  Joe Cieslak

Joe Cieslak testified that, during the time in question, he was employed at Mohawk Correctional Facility as the Inmate Grievance Supervisor. Tr. at pp. 52-53. As part of his duties, he would do weekly visits in the special housing unit ("SHU"), where he would announce himself, walk by every cell, speak to the incarcerated individuals, and provide grievance forms as needed. Tr. at pp. 54-55. The inmates are advised through Mohawk's

- 7 -

orientation process about the particulars of the Inmate Grievance Program. Tr. at p. 56. The grievance itself can be written on the preprinted form, or even a plain sheet of paper. Tr. at p. 57. The grievance is then mailed, and placed in a special box reserved for grievances, and is ultimately delivered to Supervisor Cieslak's building. Tr. at 57. The clerk in the Inmate Grievance Office date-stamps the grievances, which are then filed in numerical order, in addition to becoming part of an electronic database that includes the inmate's DIN number. Tr. at pp. 58-61. Records of the grievances are maintained in the Grievance Office for five years. Tr. at p. 62. Incarcerated individuals generally have 21 days from the date of the incident to file the grievance, and in circumstances where the grievance is considered untimely, the grievant is notified of this fact. Tr. at p. 59. Nevertheless, untimely grievances are maintained in the filing cabinet. Tr. at pp. 61-62. Claims of harassment and/or improper use of force by staff are grievable issues, with the only difference being that harassment complaints go directly to the Facility Superintendent and bypass the initial step of the grievance process. Tr. at pp. 58-60. Finally, incarcerated individuals must exhaust all steps of the grievance process. Tr. at p. 59

Michael Hudson was housed at Mohawk Correctional Facility from May 9, 2019 until approximately October 1, 2019. Tr. at p. 63. His assigned DIN number was 13A4089. Tr. at p. 62. At the request of the Attorney General's Office, Supervisor Cieslak searched his records and the available databases and based upon that review, determined that no grievance had been filed by the Plaintiff for the subject event. Tr. at

p. 65. Further, there was no request filed by Plaintiff Hudson for an extension of time to submit a grievance. Tr. at p. 65.

Finally, Supervisor Cieslak was shown Exhibit D-4, which was Plaintiff's inmate grievance Complaint. Upon review, Mr. Cieslak noted that there was no stamp affixed from the Mohawk Correctional Facility, nor was there a grievance number attached. Tr. at pp. 66-67. Based upon that, he concluded that it was never filed with the Facility. Had it been filed; he would have processed it. Tr. at p. 67.

### 3. John Krzyzanowski

John Krzyzanowski is a Correction Sergeant at Mohawk Correctional Facility. Tr. at pp. 35-36. With regard to mail, he notes that each housing unit has a designated mailbox that is available throughout the day, and the midnight roundsman collects the mail. Tr. at p. 36. With regard to inmates in the Special Housing Unit, officers collect mail when they make their count, and the mail is put into a mailbag which is held by the Control Room Officer. Tr. at p. 37. Inmates in SHU are advised of this process by way of the admissions procedure and the information is contained in a SHU Rulebook that is in each cell. Tr. at p. 38.

### 4. Sherri Debyah

Sherri Debyah was, and is, the Supervisor of the Inmate Grievance Program at Upstate Correctional Facility.[2] Tr. at pp. 19-20. She testified generally about the

---

[2] Supervisor Debyah noted that Plaintiff was transferred from Mohawk Correctional Facility on October 1, 2019, went first to Downstate, and then arrived at Upstate Correctional Facility on October 3, 2019. He stayed at Upstate until November 18, 2019. Tr. at p. 29; Exhibit D-3. She also clarified that the same procedures relative to grievances are followed at every facility. Tr. at p. 30.

grievance process. In particular, she noted that once an inmate complaint is filed and validated, her office records it and gives it a grievance number and a code. Tr. at p. 21. For example, a staff member complaint of harassment is automatically coded as "49" and goes directly to the Facility Superintendent for a response. Tr. at p. 22. All grievances are date stamped by her office. Tr. at p. 25. She herself goes to the mailroom to retrieve all the grievances and does weekly rounds. Tr. at pp. 23-24. Inmates are then notified of the grievance number assigned to the grievance. Tr. p. 26. If for some reason the grievance was determined by her office to be defective; untimely for example, the incarcerated individual would get something back explaining the problem. Tr. at p. 26. Finally, she testified that she checked her databases, and no grievance for Michael Hudson was found regarding this incident. Tr. at pp. 27, 32.

### 5. Melissa Pickett

Melissa Pickett was, at the times relevant to this case, the Inmate Grievance Program Supervisor at Downstate Correctional Facility. Tr. at p. 41. As part of her job duties, she would make weekly rounds at the special housing unit and if any of the incarcerated individuals had grievances that they wished to file, they could be submitted directly to her. Tr. at p. 44. Again, the time period to file a grievance was within 21 days, or 45 days in situations where there was mitigating circumstances that would not allow the grievance to be filed earlier. Tr at p. 43. She was also in charge of opening all the mail, including the grievances which she would date-stamp. Tr. at p. 45. The grievances would be stored in her office and kept for five years (four years plus the present year).

Tr. at pp. 46-47.  At the request of the Attorney General's Office, she searched the records in her office and found no grievance that was filed by the Plaintiff.  Tr. at p. 47.

### 6. Michael Hudson

After the Defendant had rested his proof at the Hearing, Plaintiff was called to the stand by his counsel to testify about his efforts to exhaust his administrative remedies.  Mr. Hudson acknowledged that he was indeed incarcerated at the Mohawk Correctional Facility in 2019, and that he was familiar with the grievance procedure at that Facility.  Tr. at pp. 70, 75.  After the September 4, 2019, incident with Defendant Kirkey, Plaintiff maintains that he filed two grievances.  Tr. at pp. 72 & 78.  Plaintiff testified at the Hearing that the first grievance was filed within three days of the event and was prepared on a blank piece of paper, and then placed underneath his cell door to be delivered.  Tr. at pp. 72-74.  He did not keep a copy.  Tr. at p. 77.  According to the Plaintiff, he never received a response to that grievance.  Tr. at p. 73.  He asked the Grievance Officer, Supervisor Cieslak, whether his grievance had been received and the Supervisor indicated that it had not been and there was no record of him submitting a grievance.  Tr. at pp. 73-74, 77.  Around the same time, investigators from the Office of Special Investigation (OSI) came to the facility and interviewed Plaintiff about the September 4, 2019, event with Correction Officer Kirkey, and at that point he maintained that his grievances were not being sent to the proper place.  Tr. at p. 73.  When pressed, however, Plaintiff could provide no information regarding who allegedly tampered with his grievance, or in what fashion.  Tr. at pp. 87-88

Plaintiff also testified about grievance entered as Exhibit D-4. His testimony was that this grievance was written by a fellow inmate in SHU, Salvatore Cuppuccino. Tr. at p. 78. Plaintiff testified, alternatively, that it was signed by Mr. Cuppuccino or by himself. Tr. at pp. 78-79. Plaintiff testified that he is unaware if this grievance was ever received by the Mohawk Inmate Grievance Program. Tr. at p. 80. He notes, however, that he did write to the New York State Commission of Corrections about the same incident and received a response on September 9, 2019. Tr. at p. 86; Exhibit D-10. That letter would have proceeded through the same mail route as the handwritten grievance that Plaintiff maintains was sent but never filed. Tr. at p. 87.

As a final matter of proof, the deposition testimony of Plaintiff Michael Hudson was admitted into evidence. At that deposition, Plaintiff maintained that he filed a handwritten grievance on a blank sheet of paper approximately 3 to 4 days after the incident and attributed the delay to his desire to "let . . . the heat thaw down." Exhibit D-5, Deposition of Plaintiff ("Depo.") at pp. 107-108. He put it in an envelope and sealed it. Depo. at p. 108. He inquired with the grievance officer sometime later about his grievance, and after the officer checked, he wrote back to Hudson to advise him that they had no such grievance, and further, that he had waited too many days to file one again. *Id.* at p. 112. The letter regarding the nonexistence of the grievance was received approximately 10 to 12 days after the incident. *Id.* at p. 113. After receiving that, Plaintiff became discouraged and decided to write both to Prisoner Legal Services as well as to OSI. *Id.* He has no copies of these writings. *Id.* at pp. 112-113. He did not attempt to refile his grievance. *Id.* at p. 114.

With regard to the grievance on the preprinted grievance form (marked at the hearing as D-4 and mark at the deposition as Exhibit 8), Plaintiff first testified that this was created by his neighbor in SHU, Salvadote Cuppuccino, *after* he was advised that the first handwritten grievance had not been found on file. Depo. at p. 118. However, Plaintiff then indicated that he believed that the grievance was prepared within 72 hours of the event, and that it was filed *before* his handwritten submission. *Id.* at pp. 118-119.

### C. Analysis

This Court is required to weigh the evidence and determine the credibility of the witnesses. Starting first with the defense witnesses, the Court concludes that the testimony of Seguin, Debyah, Krzyzanowski, Pickett, and Cieslak was forthright, credible, and consistent with the available records. The Court therefore concludes that the Defendant has established by the requisite standard that there was in fact a working inmate grievance procedure available to Plaintiff in 2019 at the Mohawk, Upstate, and Downstate Correctional Facilities; that the claim against Defendant Kirkey for harassment and improper use of force was one that was grievable under that process and, indeed, was subject to an expedited review by the Facility Superintendent; that the Plaintiff was well aware of the grievance procedure; and that the records from all the facilities in which Plaintiff was housed from the time of the incident until months later, establish that no grievance or appeal was filed by Plaintiff.

Considering the foregoing, and the fact that the Plaintiff is not actually claiming that he followed all the steps of the grievance procedure, the burden shifted to Plaintiff to establish that the administrative remedies outlined above were in effect "unavailable" to

him. In this case, Plaintiff Hudson has proffered the claim that the grievances he prepared and submitted for filing, were somehow lost or destroyed by an unnamed and unknown prison official. *See* Dkt. No. 81. As a result of this, Plaintiff alleges he was prevented from exhausting administrative remedies and his failure in that regard should be excused. *Id*. The Court concludes, however, that Plaintiff's assertions are not supported by the credible evidence submitted at the Exhaustion Hearing.

The Court considered several factors in making this credibility determination. In some respects, Plaintiff was a compelling witness on his behalf. However, his testimony about filing the grievance was, in significant respects contradictory, and at other times, merely based on speculation. Starting first with the handwritten grievance, the testimony at the Exhaustion Hearing was that this grievance was prepared within three days after the event, was done on a piece of plain paper, not placed in an envelope, and was pushed out underneath the door to be collected as mail. Tr. at pp. 72-73, 76. Plaintiff kept no copy of this grievance. Tr. at p. 77. There was no testimony about the exact content of this handwritten grievance. *See* Tr. at pp. 76-77. Plaintiff maintains that someone interfered with its delivery to the grievance office, but he cannot identify who that was. Tr. at pp. 76, 87-88. He does not implicate any of the witnesses who testified at the hearing in this misconduct, nor, for that matter, does he point the finger at Defendant Kirkey. *Id.*

This Hearing testimony contradicted the deposition testimony of Plaintiff, which testimony itself was internally inconsistent. At the deposition, Plaintiff began by maintaining that the handwritten grievance was prepared first, and when it was submitted

under the door, it was in a sealed envelope. Depo. at p. 108. Upon further questioning, however, his testimony changed, and he asserted that the grievance on the preprinted form that was filled out by his next-door neighbor in SHU, Salvatore Cuppuccino, was the first grievance, and was filed within 72 hours of being placed in SHU. Depo. at pp. 118-119. As Plaintiff testified to at the Deposition:

> Q. Okay. Do you -- specifically though, do you have any idea of what date [Hearing Exhibit D-4] was filed or approximately how long after the incident it was filed?
> A. This had to be filed within the first seventy-two hours of me being down there.
> Q. Okay, I thought you said that this was filed after you were told that grievance did not receive any written grievance from you?
> A. There's two of these. This is only one that I'm seeing right here.
> Q. Okay. But let's -- let's see if we can make it a little bit more clear. When you say there are two of these, are you saying this document [Hearing Exhibit D-4] is one, and then your handwritten document is another one?
> A. Yes.
> Q. Okay. Are there -- is there another grievance written on a form like this one?
> A. No.
> Q. Okay. So which one was submitted first, the handwritten document or this form [Hearing Exhibit D-4]?
> A. I believe this one was submitted first.
> Q. Okay. And when was this submitted?
> A. Probably seventy-two hours within me reaching the -- being in the box.
> Q. Okay. When was the handwritten documents submitted?
> A. After not getting a response back.

Depo. at pp. 118-119.

This is in direct contrast to the Hearing testimony in which Mr. Hudson maintained that the preprinted grievance was only filed *after* the original grievance was said not to have been received. Indeed, the very purpose of having the second grievance written and

- 15 -

sent by Mr. Cuppuccino was because of the failure of delivery of the first handwritten one. This contradiction calls into doubt the very existence of this alleged handwritten grievance.

Further, the only grievance that was produced at the Exhaustion Hearing was contained in stipulated Exhibit D-4. Admittedly, this grievance was not prepared by the Plaintiff. Plaintiff himself waffled as to whether or not he signed the grievance. Most importantly, the Plaintiff cannot tell the Court exactly where this particular grievance was sent. Tr. at pp. 91-92. Mr. Cuppuccino was never called as a witness to provide that information. The consistent testimony from the other witnesses was that the practice of the grievance program and the facility was that any grievance would be stamped, given a grievance number, and logged in. There are no records of that having been done with this particular grievance. Rather, the grievance form produced at the hearing contains only a stamp from the New York State Commission of Correction. The fair conclusion drawn from this fact is that the SHU cellmate next door to Plaintiff did indeed fill out this grievance, but he sent it to the State Commission of Correction (which responded to Plaintiff's "letter complaint" on September 9, 2017) and *not to the grievance office at the Mohawk Correctional Facility. Of course, the Commission of Corrections is independent from DOCCS, and filing a complaint with it would not qualify as a grievance under the Mohawk IGP. *Kearney v. Gebo*, 2017 WL 61951, at *6 (N.D.N.Y. Jan. 4, 2017), *aff'd*, 713 F. App'x 39 (2d Cir. 2017). The Court also notes that the Mohawk IGRC was marked "cc'd" on the preprinted grievance, Exhibit D-4, but there is no evidence that any copy of

that grievance was made by Mr. Cuppuccino and sent to anyone other than the Commission of Correction.

Plaintiff was notified that there was no report of any grievance. At the time of this notification, the 21-day reporting period had not yet expired. He made no effort to refile his grievance with the proper officials. He made no request for an extension of time to submit a grievance. Plaintiff creates the specter that members of the Mohawk Correctional Facility were attempting to stifle his complaints, but it is clear that his complaint to the Commission of Correction went unimpeded. He also apparently wrote to Prisoner Legal Services with regard to the matter, and the Office of Special Investigation talked to him with regard to his complaint. Accordingly, the Court does not find credible Plaintiff's theory that he was somehow prevented from utilizing the available Inmate Grievance Program.

### III.  CONCLUSION

The record now before the Court reflects that Plaintiff failed to file and pursue to completion a grievance concerning his claims in this action before commencing suit. The credible evidence adduced at the recent evidentiary hearing failed to yield any evidence of the unavailability of the IGP to Plaintiff or any other basis to excuse him from the PLRA's exhaustion requirement. Accordingly, it is hereby respectfully

**RECOMMENDED** that Plaintiffs Complaint (Dkt. No. 1) in this action be **DISMISSED** based upon his failure to exhaust available administrative remedies before filing suit, and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[3] days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Dated: September 11, 2023
      Albany, New York

_____
Daniel J. Stewart
U.S. Magistrate Judge

---

[3] If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).